**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ELENA P. ST. LAURENT,**

      **Plaintiff,**

-vs-                                                  **Case No. 6:05-cv-197-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## ORDER

This cause came on for consideration on the Complaint filed by Elena P. St. Laurent seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. No. 10. Pursuant to the consent of the parties, this case has been assigned to me for disposition. Doc. Nos. 12, 13.

**I.    PROCEDURAL HISTORY.**

This case considers St. Laurent's application for disability benefits under the Federal Old Age, Survivors and Disability Insurance program ("OASDI" or the "Act"), 42 U.S.C. § 401, *et seq.*, alleging disability beginning April 15, 1992. R. 58-60.[1]   This claim was denied initially and

---

[1]  St. Laurent filed an application for benefits under the Supplemental Security for the Aged, Blind and Disabled program ("SSI"), 42 U.S.C. § 1381, *et seq.* R. 15. This application was granted, and benefits were awarded as of the application date in July 2002. R. 52. The present case addresses the question of whether St. Laurent was disabled from April 15, 1992, through December 31, 1997, the date she was last insured under OASDI.

on reconsideration. R. 26-39. On July 19, 2002, St. Laurent timely requested a hearing before an administrative law judge (ALJ). R. 41.

On June 15, 2004, an ALJ held a hearing at which St. Laurent, who was represented by an attorney, testified. No other testimony was taken. R. 284-95.

After review of the testimony and evidence, the ALJ concluded that St. Laurent was insured under OASDI through December 31, 1997. He found that she had not engaged in substantial gainful activity since the alleged onset of her disability. R. 23.

The ALJ found that St. Laurent had asthma and hypertension, which were severe impairments. Her impairments did not meet or equal any impairment listed in the SSA regulations. R. 19. The ALJ also concluded that St. Laurent did not have a severe mental impairment. R. 20.

The ALJ concluded that as of December 31, 1997, St. Laurent had the residual functional capacity ("RFC") to lift and carry ten pounds occasionally and less then ten pounds frequently, to sit up to six hours and stand or walk less than two hours in an eight-hour workday. She could also stoop and use her hands for repetitive hand-finger actions. R. 23. In reaching this assessment, the ALJ found that St. Laurent's testimony about the limitations arising from her impairments was not entirely credible because it was inconsistent with the medical records and her activities of daily living. R. 20-22. The ALJ also gave little weight to the opinion of Dr. Mathias, who did not examine St. Laurent until 1999, but who rendered an opinion about St. Laurent's condition as of 1997. R. 22. The ALJ stated that he was not bound by the opinion of a doctor regarding the

claimant's condition before the doctor began treating the claimant, citing unspecified regulations and opinions from district courts in New York and Maryland. R. 22.

The ALJ determined that St. Laurent had worked as an office manager in a doctor's office and as an accounts receivable manager in a mental health facility. He relied upon a work history report prepared by St. Laurent to determine the requirements of this past work. R. 23. The ALJ concluded that St. Laurent could perform her past relevant work, as she described it, based upon her RFC. R. 23.

St. Laurent appealed the ALJ's decision to the Appeal's Council, which declined to review the ALJ's decision. R. 6. Thereafter, she timely filed the complaint in this case. Doc. No. 1.

**II.     JURISDICTION.**

Because the Commissioner rendered a final decision on St. Laurent's application, this Court has jurisdiction to review that decision under 42 U.S.C. § 405(g).

**III.    STATEMENT OF FACTS.**

*A.     St. Laurent's Testimony and Written Statements.*

St. Laurent was born on April 19, 1944. She is 5'3" tall. On the day of the hearing, she weighed 250 pounds. R. 285. She estimated that her weight in 1992 had been between 135 and 140 pounds, and that she weighed between 140 and 148 pounds in 1998. R. 285. She attributed the weight gain to use of steroids for her asthma. R. 285.

St. Laurent completed high school. R. 286. She worked as a office manager in a doctor's office during the fifteen years before the date she alleged that her disability began. R. 65, 288. In a work summary report, St. Laurent wrote that she walked two hours, stood two hours, and sat five

hours a day in this job.  She also had to stoop, crouch and reach, and write, type or handle small objects.  She carried less than ten pounds.  As part of the job, she supervised others.  R. 65.

She also worked as an accounts receivable manager at Lakeside Alternatives from October 1991 through April 1992.  R. 65, 76.  She described this job as similar to the office manager job.  R. 78.  In it, she was required to lift less than ten pounds.  R. 78.  At some point in 1996, St. Laurent operated a consulting business called Shape Business Consultants, at which she worked approximately twenty-five hours per week.  R. 105, 159.

St. Laurent developed respiratory problems in the early 1990s.  R. 286.  Medication used to treat asthma caused her blood pressure to rise.  The high blood pressure caused her heart to race, nose bleeds, and dizziness.  The asthma medication caused swelling.  She had had difficulty sleeping because she had to be careful not to block her airways.  R. 287, 292.

As a result of her asthma, she could not go into an area with odors, such as perfume, or where she might come in contact with some who had a cold.  R. 287.  When her heart raced due to medication, she could not write.  R. 289.  She had nose bleeds two or three times a day with associated dizziness.  R. 289.  She was also shaky and sometimes disoriented.  R. 293.

St. Laurent suffered a stroke in 1999.  R. 288.  Due to high blood pressure, St. Laurent could only stand for a minute before needing to sit down.  R. 190.  When she sat down, she leaned on a pillow to help her breathe.  R. 290-91.  She could not frequently lift a gallon of milk.  R. 291.

In 1997, St. Laurent could cook, but not dust, vacuum, carry laundry or do other heavy lifting.  R. 289-90.  She had a driver's license at the time of the hearing, but she did not drive at

night because the light disoriented her.  She also did not drive in the rain because doing so made her dizzy.  R. 286.

      *B.*      *Relevant Medical Evidence.*

The earliest medical records are from John R. Hartman, M.D., who began treating St. Laurent at least as early as January 1992.  R. 153.  Medical records throughout 1992 reflect that St. Laurent had wheezing and a productive cough.  TR. 144, 152-53.  Dr. Hartman's assessment was allergic or asthmatic bronchitis.  R. 148-53.  On October 13, 1992, Dr. Hartman advised St. Laurent not to return to work at Lakeside Alternatives due to her respiratory difficulties resulting from mold and mildew in the building where she worked. R. 147.

In December 1992, Dr. Hartman diagnosed asthma and hypertension.  He also noted that use of Prednisone caused St. Laurent to swell quite a bit.  R. 146.

In 1993, St. Laurent continued to present with respiratory problems, including cough, phlegm, and a sore throat.  Dr. Hartman's records continually reflect the diagnosis of hypertension as well.  *See, e.g.,* R. 137, 142-45.  In October 1993, St. Laurent reported that after going for a two-mile walk and getting in a pool, her right leg tightened up.  R. 140.  At a follow-up in November 1993, St. Laurent reported that this muscle strain was responding well to therapy.  R. 138.

Diagnoses of bronchitis, asthma, hypertension, and related fatigue continued through 1994.  R. 121-37.  St. Laurent told Dr. Hartman in October 1994, that she was flying to New Jersey the next morning for a three week trip.  She had been awake since 5:00 a.m. that day "running around, taking her husband to work, and fixing a flat tire, etc., etc."  R. 127.

In 1995, Dr. Hartman diagnosed reactive airway disease, bursitis, and sinusitis, in addition to asthma. R. 113-14, 121-23. St. Laurent reported experiencing some jitteriness with Albuterol MDI. R. 113.

In 1996, Dr. Hartman noted that St. Laurent's hypertension was poorly controlled, and he observed general swelling. R. 109. She also had episodes of exacerbation of her asthma. R. 110.

Cynthia Asbell, ARNP, in the office of Kerry M. Schwartz, M.D., at the Florida Heart Group, examined St. Laurent on March 6, 1996. St. Laurent reported that following Prednisone injections and use of nebulizers to control her asthma, she experienced an elevated heart rate with "fluttering" and elevated blood pressures. She occasionally also had ankle edema. R. 159. At this examination, St. Laurent weighed 186 pounds. R. 160. An electrocardiogram showed sinus tachycardia.[2] R. 160. Asbell observed that St. Laurent's hypertension was not well controlled. R. 161.

In a follow-up examination in April 1996, St. Laurent indicated that she had sinus tachycardia intermittently. Her weight had increased, and she admitted to failing to follow the prescribed diet and failing to exercise. Asbell's assessment remained uncontrolled hypertension and sinus tachycardia. R. 157-58.

On May 1, 1996, St. Laurent reported that she was exercising regularly and had completed three Disney parks in the previous week without difficulty. R. 155. She had bilateral edema in her lower extremities after standing all day. R. 155. She was not experiencing headaches. R. 155.

---

[2] A heart rhythm disorder involving fast heart rates. Symptoms include fainting, dizziness, light-headedness, confusion, palpitations, chest pain, shortness of breath, and fatigue. *See* MedLine Plus, *Sick Sinus Syndrome*, at http://www.nlm.nih.gov/medlineplus/ency/article/000161.htm (last visited February 7, 2006).

Asbell noted that St. Laurent's hypertension was better controlled on her current medication regimen. R. 156.

St. Laurent was treated by Christopher M. Chappel, M.D., at Family Practice Associates from July 1996 through April 2002. R. 162-87. In August 1996, St. Laurent weighted 190 pounds. R. 187. Treatment notes dated 1996 and 1997 reflect continuing bouts of asthma, bronchitis, and sinusitis. R. 183-86.

Patrick F. Mathias, M.D., began treating St. Laurent in October 1999. R. 224. During his first examination of St. Laurent, she reported that asthma had not been a problem for her recently. R. 224. Dr. Mathias noted that St. Laurent had had a stroke, but she was making a fairly good recovery. Her hypertension remained uncontrolled, and she had sinus tachycardia. She was also obese, weighing 217 pounds. R. 224-25. Dr. Mathias continued to treat St. Laurent on a regular basis through 2004. While he seldom treated St. Laurent for asthma or other respiratory complaints, *but see* R. 219, his treatment notes consistently reflect diagnoses of bronchial asthma as well as hypertension. R. 188-204, 270.

On February 2, 2004, Dr. Mathias completed a Cardiac Residual Functional Capacity Questionnaire. R. 270-74. He wrote that St. Laurent had hypertension (HTN) and asthma, among other conditions. Her symptoms were shortness of breath, fatigue, weakness, palpitations, and dizziness. R. 270. He observed that stress markedly elevated St. Laurent's blood pressure, and opined that St. Laurent was incapable of even low stress jobs. R. 271. Dr. Mathias concluded that St. Laurent could walk one to two city blocks without rest or severe pain, and could sit, stand and walk for less than two hours in an eight-hour workday. R. 272.  She could occasionally lift up to

ten pounds, but not more. R. 273. When sitting, her legs should be elevated. She would need to take ten to twenty minutes breaks every two hours. R. 273. She had a limited ability to bend and twist. R. 273. She also must avoid all exposure to fumes, odors, dusts and gases, perfumes, cigarette smoke due to asthma, and she should avoid even moderate exposure to extreme temperatures. She should also avoid concentrated exposure to high humidity. R. 273. Dr. Mathias opined that the symptoms and limitations he identified applied as of 1997. R. 274.[3]

## IV.   STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

---

[3] While the handwritten date entered on the form by Dr. Mathias is less than clear, the ALJ concluded that the date is 1997. R. 22.

>	(1) Is the claimant presently unemployed?
>
>	(2) Is the claimant's impairment severe?
>
>	(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
>	(4) Is the claimant unable to perform his or her former occupation?
>
>	(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

This Court's review of a final decision by the SSA is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987)(quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported

by substantial evidence even if the proof preponderates against it.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.     ANALYSIS.**

St. Laurent raises a number of issues in her appeal.  I will address only the argument that the ALJ did not give proper weight to the functional capacity assessment prepared by Dr. Mathias, one of St. Laurent's treating physicians, because I find it to be dispositive.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)(citing 20 C.F.R. § 404.1527(d)(2)).  Further, it has long been the law in this circuit that "a treating physician's opinion is still entitled to significant weight notwithstanding that he did not treat the claimant until after the relevant determination date." *Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983).  Thus, the ALJ erred as a matter of law when he relied upon decisions from courts in other circuits to support his conclusion that he was entitled to give little weight to "the opinion of a doctor as to what must have happened several years before he became the claimant's treating physician."  R.  22.

Furthermore, the ALJ did not articulate good cause for giving little weight to Dr. Mathias's opinion.  While the ALJ correctly stated that Dr. Mathias first examined St. Laurent approximately

-10-

twenty-one months after the date she was last insured under OASDI, he omitted from his decision the evidence that Dr. Mathias treated St. Laurent for hypertension and asthma, both of which had plagued her since 1992.[4] Had the ALJ considered the substance of Dr. Mathias's treatment records, he might have concluded that Dr. Mathias was in an excellent position to observe how St. Laurent's hypertension and asthma limited her functional capacity.

Accordingly, remand is required to permit the Commissioner to evaluate Dr. Mathias's functional capacity assessment in the manner required under the law of this circuit. If an ALJ concludes on remand that St. Laurent had non-exertional limitations in her ability to work between April 1992 and December 31, 1997, the ALJ has a duty to develop the record fully regarding the non-exertional and environmental factors associated with St. Laurent's past relevant work at step four of the evaluation process. *See Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987)("Although a claimant bears the burden of demonstrating inability to return to his past relevant work, the [Commissioner] has an obligation to develop a full and fair record.").

**VI.   CONCLUSION.**

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings. The Clerk of Court is directed to issue a judgment

---

[4] The ALJ's summary of the information contained in Dr. Mathias's treatment records was as follows: "Dr. Patrick F. Mathias was the claimant's treating cardiologist beginning October 1999. (Exhibit 4F)." R. 19.

reversing the decision of the Commissioner of Social Security and remanding the case for further proceedings and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 9, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record